STONE *v.* STONE.

DIVORCE—ALIMONY—CHANGE OF CIRCUMSTANCES.

Order amending decree of divorce as to alimony on husband's third petition, by requiring him to make 2 back payments of $85 each and thereafter requiring him to pay $50 a month to wife during her lifetime or until she remarried is reversed and all alimony past and present cancelled and discontinued without prejudice to the right of plaintiff to file a future petition to modify, based upon an adequate showing of changed conditions, where it appears the wife was earning $270 monthly, their only child was 25, through college and was working, defendant husband had lost the job he had at time divorce was granted and had a net income of less than $600 a year before payment of personal living expenses.

Appeal from Calhoun; Hatch (Blaine W.), J. Submitted January 9, 1957. (Docket No. 17, Calendar No. 47,024.) Decided July 31, 1957.

Following a decree of divorce granted to Frances Fish Stone in her suit against her husband, Micajah Linton Stone, and after the passage of some years, the defendant, upon changed circumstances, petitioned for discontinuance of alimony. Order entered in reduced amount. Defendant appeals. Reversed and decree ordered cancelling and discontinuing alimony.

*Hatch & Sculthorp,* for plaintiff.

*Pierce & Planck,* for defendant.

REFERENCES FOR POINTS IN HEADNOTES
17 Am Jur, Divorce and Separation §§ 742–749.

VOELKER, J.  This case could well be called "The Troubles of Micajah Stone."

Once again we are confronted by the case of an aggrieved divorced husband who complains to this Court that the trial court did him wrong on his petition to modify a decree of divorce as to alimony. The facts are these:

In 1941 when his wife divorced him Micajah Stone was regularly employed as a salesman by the Peabody Coal Company at a salary of $275 per month. In addition he was provided with an automobile and reimbursed for all travel costs and expenses.  He did not contest the divorce and prior to the hearing entered into a property settlement with the plaintiff whereby he agreed to pay her $125 per month for the support and maintenance of the plaintiff and the minor daughter of the parties, continuing during plaintiff's lifetime.  The settlement further provided that if the wife should remarry he should thenceforth be relieved of all obligation for her support, and that in such event he would pay the plaintiff $65 monthly until the child had finished high school or reached 18.  The settlement further provided that in the absence of any such remarriage by the plaintiff he should continue to pay the $125 monthly during her lifetime. · This settlement was approved in the subsequent divorce decree and its terms incorporated in the provisions for alimony.  The defendant was not represented by counsel in reaching the settlement.

The plaintiff did not remarry.  In 1953, twelve years after the divorce, the defendant fell on evil days.  The Peabody Coal Company cut its working forces and, along with a number of other old employees, he lost his job.  He found a new job with the Pillsbury Chemical Company as a salesman on commission.  He had a drawing account of $400 monthly but had to provide his own car and pay his own

traveling and other expenses. It was not enough and he fell behind in his alimony.

In October, 1953, he filed a petition to modify the original decree of divorce as to alimony. In his petition he alleged the foregoing facts, adding that his former wife was healthy and able-bodied and well able to work and support herself. He prayed that his alimony payments be discontinued.

This petition was heard by the same judge who granted the original divorce. An unnamed amount of arrearage in alimony was cancelled and he was ordered to pay $65 per month for 6 months to enable him to get established in his new job with the chemical company. He was also ordered to pay her $85 per month for life after the 6 months was up. The order was filed January 11, 1954.

Micajah's troubles were not over. Things did not go well at his new job at the chemical company and he was running behind both in his alimony and living expenses. On January 1, 1955, he found still another new job as an insurance salesman. During the first month he earned $55 in commissions. He also received $87 from his last employer for part-time work he had done. In March, 1955, he filed another petition to modify, alleging the foregoing facts, and further alleging that since the last amendment to the decree (January 11, 1954) the daughter had reached 23 and graduated from college and was working. He also alleged upon information and belief that the plaintiff had since gone to work and was earning $240 per month. He again prayed that all alimony payments be discontinued.

The same judge heard this second petition and on April 20, 1955, the decree was again amended to cancel an unnamed arrearage in alimony, and, with the consent of the plaintiff, all alimony payments for 1 year were suspended. Thereafter it was provided

that he should resume the monthly alimony payments of $85.

Shortly after the foregoing year of grace was up, on April 30, 1956, Micajah Stone filed his third petition to modify, the one that concerns us here. In this last petition he recited the 2 previous amendments to the original decree. He alleged that the daughter was now 25 and working and again alleged his belief that the plaintiff was working and earning $240 per month. He also alleged the following gross income for 1955: from his new job as an insurance salesman, $848.64; from work on the side for his old employer, Pillsbury Chemical, $911.25; from commissions on insurance he had sold for Prudential Insurance Company, $144.39; from interest or rebate on an income tax deposit, $3.26; total gross income for 1955 from all sources, $1,907.54.

He further alleged that he needed a car in his insurance business; that he had bought a used Oldsmobile in 1953 upon which the 1955 running expenses were $1,191.31; that additional business expenses were $122.20; that his net earnings in 1955 were $593.97; that his personal expenses were $1,778.85, accordingly leaving him in the red for the year. He alleged that he was unable to resume the $85 monthly payments and was in fact unable to pay any alimony. He prayed that all alimony be discontinued.

In her answer filed May 14, 1956, the former wife admitted that the daughter was working and self-supporting and further admitted that she herself was employed and earning $240 per month. She neither admitted nor denied the defendant's allegations concerning his 1955 income and expenses. She also alleged that since the last amendment to the decree he had married his boss in the insurance agency and that therefore the new wife's insurance agency records and income should be made a part of the hearing. She denied that the defendant was unable

to continue to pay her alimony and, in her answer, requested that the trial court "obtain information from him as to the investments that he may have." Finally she prayed that the petition to modify be dismissed.

The matter was heard during May, 1956, by the same judge who granted the original divorce and who had heard the 2 previous petitions to modify. The petitioner, Micajah Stone, testified to the income and expenses as alleged in his petition. He also testified that he had taken 2 insurance courses at Michigan StateUniversity. He testified in detail concerning his personal and business expenses. He stated that he had paid his former wife some $295 during 1955, consisting of 2 alimony payments of $85 and the rest for her attorney and traveling expenses.

He testified that as of May 1, 1956, his 1956 income was showing some "modest gains" over 1955, but that he still could not afford to pay any alimony. He testified that he married for the second time on May 27, 1955, but had not as yet contributed anything substantial to the expenses of the household, which was being kept up and paid for by the new wife, who was the largest stockholder in the insurance agency for which he worked. On cross-examination he testified that he had once owned some stocks which he had been obliged to sell after he lost his first job at a net gain of $25. He testified that he had not bought any new clothing for 3 years and needed some.

The former wife testified briefly that for "12 or 14" years she had lived in Lexington, Kentucky; that she was now 51; that neither the daughter nor anyone was dependent on her; that her net income from her work for an insurance agency or company— "group," she called it—would shortly be decreased by an unnamed amount by the advent of the new Kentucky income tax.

On cross-examination by defendant's attorney it was brought out that for 2 years she had been paid a salary of $270 (not the $240 she had in her answer admitted receiving, which answer was filed 4 days before the hearing at which she testified). She stated that her net after taxes was $217 per month. She did not explain why in her answer to this petition or the last she had not divulged that her monthly salary was $270 instead of $240. She did not claim to be in ill health or in debt, but did state that she was unable to accumulate any savings.

Further facts should be brought out. There is affirmative evidence in the record before us that at the hearing the trial court may not have had all the facts correctly in mind when he made his decision. We draw the following examples from the record:

"*The Court:* Well of course the testimony we took the other day over in Battle Creek is to the effect his gross earnings for 1955 were $1,907.55. Then in addition to that there was a dividend for $911.25 from Pillsbury Chemical. He earned $2,818.79 apparently and that was his income, for that year."

Comment: The testimony over at Battle Creek was to the effect that the $911.25 represented commissions as a salesman for Pillsbury Chemical and was not a dividend. Moreover, it was included in the gross earnings of $1,907.54 for 1955. Counsel then explained the court's error and was rewarded for his pains as follows:

"*The Court:* I don't get it that way—$1,907.54. Then the dividend from Pillsbury Chemical."

The court also apparently confused the defendant's 1955 earnings from the insurance company with his withholding tax of $16.97, although this was the first exhibit in the case.

"*The Court:* I put it down, exhibit 1, over in Battle Creek, unless you gentlemen still have them, with-

holding tax statement, Stratton Insurance Agency,. $848.64. For withholding tax, what's the amount,. do you know how many dependents he claimed?

"*Mr. Planck:* That's the amount Stratton paid him.

"*The Court:* You claim that's the amount he was paid by the Stratton Company?

"*Mr. Planck:* That wasn't the amount withheld from his earnings. The amount withheld was $16.97."

The court also nourished and clung to the erroneous idea that the defendant owned the Pillsbury Chemical Company, at which he could not make a go of it as a salesman after he lost his coal company job in 1953. There is nothing whatever in the record to give this impression.

"*The Court:* This one business he runs, Mr.. Planck, the Pillsbury Chemicals, that is his own business, isn't it?

"*Mr. Planck:* No it is not. He is a salesman. He was a salesman for them before he went into the insurance business."

Again, addressing the defendant:

"*The Court:* Then the company that you have— that is yours— is the Industrial Chemical Sales? Is that right?

"*A.* It is not my company, I have no interest in it. I work for them and I get a commission on the sales I make.

"*Mr. Planck:* Q. What do you sell for Pillsbury Chemicals?

"*A.* Industrial chemicals—in the Lansing area. I work as a salesman for Pillsbury Chemicals and for the insurance company, the same as that of an automobile salesman who sells an automobile. He gets a commission."

Despite repeated explanation there was persistent confusion in the court's mind as to the earnings of

the defendant and his relationship to the companies he worked for. The court was addressing the defendant:

"*The Court:* Then you entered your wages $1,904.-28 and then you show here $591.71.

"*A.* That's the net.

"*The Court:* Isn't net at all. That's what you got out of your chemical company.

"*A.* Out of the chemical company I got $911.

"*The Court:* Out of the chemical company your net was $590.71."

Comment: The defendant alleged and the testimony showed that during 1955 he earned $911.25 in commission as a salesman for the Pillsbury Chemical Company, which he did not own or possess any interest in. The alternate figures of $591.71 and $590.71 referred to by the court above was evidently the $593.97 net earnings of the defendant from all sources in 1955 before personal expenses.

Then shortly before making his final order the court showed a fleeting disposition to bestow additional largesse, seeking to endow the defendant with ownership of the coal company from which he had got fired in 1953. The court was again addressing the defendant:

"*The Court:* Apparently they did not have any property at the time of the settlement. Did you have any property at all, Mr. Stone?

"*A.* No, the only thing I had was personal property.

"*The Court:* Did you own the coal yard?

"*A.* I was representative of a producing company."

And yet again:

"*The Court:* It seems to me, with what he is earning, if he is required to pay instead of $85, $65 a month, he could easily pay that and still get along.

That would be $720 a year, more, if he paid $60 a
month. And it seems to me he is earning sufficient in-
come so he could pay that. That is cutting the
amount $25 a month, mister, I think, under the evi-
dence here, unless you have something more to say.

"*Mr. Planck:* Yes, your Honor, I think the record
shows from these 3 sources, his income from Pills-
bury Chemical, the Stratton Insurance Agency, his
earnings were $1,904.28.

"*The Court:* I don't get it that way—$1,907.54.
Then the dividend from Pillsbury Chemical.

"*Mr. Planck:* Then there is his expenses of $1,313.-
57—business expenses. Leaving him about $590 to
live on."

The court persisted to the very end:

"*The Court:* Well on the basis that he is making
$1,907.54 a year and it now shows his car expenses
are being paid outside, apparently his income is
increasing instead of decreasing, because he has the
same commissions on those policies he has written,
and will throughout the years, it seems to be at the
present time, that the amount should be reduced to
$50 a month, that is $600 a year. That leaves him
$1,354 a year to live on. We will reduce it to $50 a
month."

The trial court accordingly amended the decree
ordering the defendant to pay the plaintiff $50 per
month in alimony during her lifetime or until she
remarried. The amended decree also ordered the
defendant to make 2 monthly payments of back ali-
mony at $85 per month. This appeal has resulted.

Some cynic is reputed to have said that the only
right a man can be sure of these days in a divorce
court is his right to pay alimony. We are afraid
that it is decisions like the one in this case that lend
weight to that sour view and which encourage car-
toonists and comedians and male marital casualties
to refer to alimony as a racket.

At the outset we wish to make clear our firm belief that when marriages are blasted and homes are sundered alimony is at best a rickety and makeshift arrangement. Especially is this so where there are children. We also hazard the guess that there are probably far more instances of too little alimony and support being paid than too much. We do not seek to minimize the grave and sometimes tragic sociological and personal problems inherent in divorce. But unless our courts are going to punish the innocent for the sins of the guilty we must judge each case on its merits. It strikes us that, unless this Court is resolved never to disturb the findings of a trial court in these alimony matters, Micajah Stone deserves relief.

After may years of service without his fault he suddenly lost his job with the coal company. He got a new job in a new field but couldn't make a go of it. Since his former wife is 51 we assume that normally he must be all of that or more. To our mind he is an obscure and almost classic example of the plight of the aging white-collar worker, the displaced salesman nearing the end of the line, who at last in desperation turns to selling insurance—the groping man in the soiled 3-year-old gray flannel suit. In our view Micajah Stone scarcely needs, in addition, the stone of alimony tied around his neck.

Unless this Court is prepared to embrace theology and ordain that alimony is henceforth to be regarded as a kind of permanent reward for feminine virtue or perpetual punishment for masculine sin, regardless of the circumstances, we think this is a case plainly calling for relief. We had always understood that the allowance of alimony is not so much an act of piety or judicial gallantry or the benign exercise of a sort of ponderous romanticism and archaic chivalry as one of cold economics based upon 2 main factors: need and ability to pay. And we have a statute ex-

pressly permitting the periodic modification of decrees for alimony, up or down, upon a showing of new conditions or changed circumstances since the original decree (CL 1948, § 552.28 [Stat Ann 1957 Rev § 25.106]).

At no time has this defendant displayed a contemptuous attitude either towards the court or his obligations. It appears that he continued faithfully to pay the full $125 monthly long after the child graduated from high school and reached 18 and as long as he was able. The child became 21 in 1952 and yet he did not petition to modify until after he lost his old job with the coal company in 1953, when he was forced to. At that time his monthly alimony payments were reduced to $85, although in the original settlement itself, when the wife was not yet working and was represented by counsel, she apparently herself set an implied value of $60 monthly as her share of the agreed payments of $125. (We refer to the provision in the original settlement and decree providing for $65 monthly for the child in the event of plaintiff's remarriage.)

During the hearing below plaintiff's counsel wanted the books of the insurance company produced and the hearing was adjourned for that purpose. While the books tended to confirm most of the defendant's allegations and prior testimony as to his commissions and income from that source, the plaintiff both there and here would make much of the fact that the books also disclosed that the insurance company had paid some $138 of the defendant's gasoline bill during the period in which he spent the amounts he alleged for business and personal expenses. The implication is that he had padded his expenses in order to get relief from alimony. We see no evidence of deliberate padding in this record and we would observe that any man in these days of inflation who makes a net annual income of less than $600

before payment of personal living expenses is scarcely in a position to be paying alimony even if his personal expenses were nil. We are utterly without frivolity when we suggest that under this record it strikes us that the former wife is in a far better position to be paying alimony than her former husband.

Divorce is no longer a luxury or an exclusive franchise of the rich and, all moral and theological questions aside, it appears more than likely that it is here to stay. It is firmly entrenched in our folkways, and even the poor appear to have discovered its presumed delights and taken it over. We therefore believe that it is meet and just that the actions of our courts on matters of alimony should bear some moderate relation to the station of the litigants and the facts of life.

We are aware that this Court rarely disturbs the findings and rulings of the trial court in cases arising on petitions to modify. The judicial formula runs something like this: The trial judge has had an opportunity to hear and judge the witnesses; he is in a much better position to appraise the situation; the awarding of alimony and modification of divorce decrees rests largely in his discretion; and, finally, only in cases where there is a clear and manifest abuse of that discretion will his award be interfered with on appeal.

It is true that with the timorous aid of defendant and his counsel the trial court seemed occasionally to obtain a faint grasp of the salient facts. But the grasp was both weak and fleeting and, as the record shows, the court was soon back again seeking to make the impoverished defendant an entrepreneur of coal and chemicals. After an appraisal of the entire record we cannot fairly say that we possess any feeling of confidence that the court was in firm possession of the real facts when it made its decision.

But we refuse to base our decision on what the trial court may or may not have believed. Even if the trial court were not confused on the facts upon which he based his last-amended decree, we think he was wrong. We believe this is a case calling for relief for the simple reason that there was a positive showing buttressed by plaintiff's own testimony that the former wife did not at the time of the hearing need any alimony, plus an equally positive and undisputed showing by the defendant that he was unable to pay. Any confusion of the trial court is irrelevant and forms no basis for our decision, then, except as it may show not so much an abuse of judicial discretion as an incomprehension of the basic operative facts upon which any such discretion might validly have been exercised.

The order amending the decree below is reversed and an amended decree is entered here cancelling, discontinuing and terminating all alimony, without prejudice, however, to the right of the plaintiff to file a future petition to modify based upon an adequate showing of changed conditions and circumstances. Costs to the prevailing party.

SMITH, EDWARDS, and BLACK, JJ., concurred with VOELKER, J.

DETHMERS, C. J., and SHARPE, KELLY, and CARR, JJ., concurred in the result.